## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JASON SALLAZ,

              Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

CASE NO. 4:22-cv-01239

DISTRICT JUDGE PATRICIA A. GAUGHAN

MAGISTRATE JUDGE AMANDA M. KNAPP

**REPORT AND RECOMMENDATION**

Plaintiff Jason Sallaz ("Plaintiff" or "Mr. Sallaz") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1; ECF Doc. 8.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2. For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

### I.  Procedural History

Mr. Sallaz filed his DIB application on July 17, 2019, alleging a disability onset date of April 23, 2019.  (Tr. 15, 198-204.)  He alleged disability due to: broken right and left femurs, now with rods; back pain and numbness due to a shorter leg; depression, anxiety, limited learning ability; and sleeplessness, thyroid cancer, and removal of thyroid.  (Tr. 82, 99, 113, 121, 223.)  His application was denied at the initial level (Tr. 113-15) and upon reconsideration (Tr. 117-21).  Following Mr. Sallaz' request for a hearing (Tr. 122-23), a hearing was held before an

Administrative Law Judge ("ALJ") on October 15, 2020 (Tr. 43-81).  The ALJ issued an

unfavorable decision on January 13, 2021, finding Mr. Sallaz had not been under a disability

from April 23, 2019, the alleged onset date, through the date of the decision.  (Tr. 12-42.)

Plaintiff requested review of the decision by the Appeals Council.  (Tr. 165-97.)  The Appeals

Council denied his request for review on May 16, 2022, making the ALJ's decision the final

decision of the Commissioner.  (Tr. 1-6.)

## II.      Evidence

The evidence summarized herein is generally limited to evidence relating to the issue

before this Court, which concerns Mr. Sallaz' physical impairments and limitations.  Mr. Sallaz

discusses a medical record that post-dates the ALJ decision.  However, as discussed in Section

VI.B., *infra*, such evidence is not relevant to Mr. Sallaz' sentence four remand argument and Mr.

Sallaz did not properly raise a sentence six remand argument.  Accordingly, the post-decision

medical record is summarized in Section II.B.3, *infra*, only for background.

## A.      Personal, Educational, and Vocational Evidence

Mr. Sallaz was born in 1984 and was thirty-four years old on his alleged disability onset

date.  (Tr. 36, 49, 198.)  He completed high school and received mechanic and machinist

vocational training.  (Tr. 36, 50, 224.)  He worked as a die caster. (Tr. 52-58.)

## B.      Medical Evidence

### 1.      Treatment History

Mr. Sallaz' primary care physician was Daniel Miller, M.D., of Community Medical

Associates.  (Tr. 300.)  Mr. Sallaz fractured his right femur in a 2003 motor vehicle accident

which required rod replacement.  (Tr. 59, 309, 310, 358.)  He fractured his left leg in 2017 when

a tree fell on him.  (Tr. 58, 64-65, 310, 358.)  He received treatment from Dr. Miller for his leg

injuries, low back pain, and other medical conditions, beginning prior to the alleged onset date. (*See generally* Tr. 309-55.)  Mr. Sallaz presented to Dr. Miller on March 13, 2019, a month before the alleged onset date, complaining of knee pain. (Tr. 311.)  He reported that he had been without insurance and felt his knees were shot.  (*Id.*)  He was in the process of applying for disability.  (*Id*.)  Examination of his extremities revealed no cyanosis, clubbing, or edema, but slightly decreased range of motion in the right leg.  (Tr. 312.)  He received two Kenalog injections with Lidocaine.  (Tr. 312, 388.)

Mr. Sallaz returned to Dr. Miller on May 28, 2019, complaining of left leg "pinching" and pain with walking.  (Tr. 310, 359.)  He was concerned that the screws in his left knee were loose.  (*Id*.)  There was again no cyanosis, clubbing, or edema in the extremities, but slightly decreased range of motion in the right leg.  (Tr. 311.)

Mr. Sallaz presented to orthopedic surgeon John J. Stefancin, M.D., on May 30, 2019 for evaluation of his knees.  (Tr. 357-58.)  He reported that his left knee was worse than the right. (Tr. 358.)  Examination findings included: positive effusions in the knees bilaterally, with minimal crepitus and good patellar mobility; medial joint line tenderness; positive McMurry's sign on the medial joint line; negative McMurray's sign on the lateral joint line; pain posteriorly with deep flexion and full extension; tenderness to palpation over the distal lateral aspect of the screwheads in the distal femur; antalgic gait; range of motion to 120 degrees in the right knee and to 125 degrees in the left knee; no muscle atrophy bilaterally; and normal strength, sensation, and pulses. (*Id*.)  Dr. Stefancin recommended MRIs of both knees.  (Tr. 357.)

Left and right knee MRIs were performed on June 17, 2019.  (Tr. 360-63.)  The right knee MRI showed: mild scarring in the Hoffa's fat pad with femur intramedullary rod; no appreciable debris of ossification identified; and mild medial meniscus intrasubstance

degeneration with no distinct tear and no joint body identified.  (Tr. 363.)  The left knee scan

showed: mild scarring in the Hoffa's fat pad; a one-centimeter ossified body near the femoral rod

insertion; and no meniscal tear or ligament injury.  (Tr. 362.)

Mr. Sallaz returned to Dr. Stefancin on July 11, 2019 for follow up regarding his MRIs.

(Tr. 356.)  He reported that his right knee was "not bad," but his left knee was worse.  (*Id.*)

Examination findings included: small effusions in the bilateral knees, with good patellar mobility

and minimal crepitus; no tenderness along the screw sites on the right, but tenderness along the

distal femur on the left at the location of the screws; range of motion to 120 degrees on the right

knee and to 125 degrees on the left knee; slightly antalgic gait; no muscle atrophy bilaterally; and

normal strength, sensation, and pulses.  (*Id.*)  Dr. Stefancin reviewed the MRI results and

diagnosed bilateral knee retrograde femoral rods with loose body and symptomatic distal femoral

screw hardware.  (*Id.*)  Mr. Sallaz reported soreness around the screws in the left knee and

expressed interest in having the screws removed at some point.  (*Id.*)  He was not sure as to the

timing and indicated he would let Dr. Stefancin know when he was ready to do so.  (*Id.*)

Mr. Sallaz returned to Dr. Miller on August 2, 2019.  (Tr. 387, 400.)  His examination

again revealed no cyanosis, clubbing, or edema, but a slightly decreased range of motion in the

right leg.  (Tr. 400.)  He received a Kenalog injection in the left knee.  (Tr. 387, 400.)

Mr. Sallaz next returned to Dr. Miller almost a year later, on June 4, 2020.  (Tr. 402.)  He

complained of pain in his left leg, pain with walking, worsened chronic back pain, and lower

back weakness with radiating pain and numbness in his legs.  (*Id.*)  He continued to express

concern that the screws in his left knee were loose.  (*Id.*)  Examination findings again revealed

no cyanosis, clubbing, or edema, but slightly decreased range of motion in the right leg.  (*Id.*)

Additional examination findings included muscle spasms in the lumbar paraspinal muscles,

positive straight leg raise on the left with no pain over the spinous processes, normal strength and sensation, +2 knee reflexes, and +1 bilateral Achilles reflexes.  (*Id.*)  Mr. Sallaz' gait was within normal limits.  (*Id.*)  He was diagnosed with leg pain and received Kenalog injections in both knees.  (Tr. 403.)  He was also diagnosed with lumbago, described as chronic and progressive.  (*Id.*)  Dr. Miller indicated that Mr. Sallaz had failed conservative therapy for his back condition and an MRI was needed for further evaluation.  (*Id.*)

An August 27, 2020 lumbar MRI showed: degenerative disc disease at L4-L5 and L5-S1; a small right paracentral annular fissure and disc protrusion at L4-L5 minimally contacting the right L5 nerve root; no spinal stenosis or significant neural foraminal narrowing; and some abnormal bone marrow signal intensity within the T12 vertebral body (Tr. 418-19, 423-24.)

Mr. Sallaz returned to Dr. Miller on September 11, 2020.  (Tr. 421.)  Examination findings were similar to those on June 4, 2020.  (*Compare* Tr. 421 *with* Tr. 402.)  Dr. Miller indicated Mr. Sallaz would be scheduling with orthopedics soon for his leg pain.  (Tr. 422.)  With respect to Mr. Sallaz' back condition, Dr. Miller indicated Mr. Sallaz failed conservative therapy, would need a bone scan because the MRI raised a question regarding an abnormal bone lesion, and would be sent for an epidural evaluation due to a herniated disc.  (*Id.*)  A follow-up bone scan of the T12 vertebra was performed on October 1, 2020, and showed no abnormalities.  (Tr. 425.)  He underwent a functional capacity evaluation on November 2, 2020.  (Tr. 428-35.)

### 2.    Opinion Evidence

#### a.  Functional Capacity Evaluation

Mr. Sallaz presented to Michelle Godek, Ph.D., AT and Jamie Hart, PT, AT, DPT at Lake Health for a Functional Capacity Evaluation ("FCE") on November 2, 2020.[1]  (Tr. 428-35.)

---

[1] The metrics used for functional abilities were: "minimally occasional," 1-5% (0 to .5 hrs.); "occasionally," 6-33% (.5 to 2.5 hrs.); "frequently," 34-66% (2.5 to 5.5 hrs.); and "continuously," 67-100% (>5.5 hrs.).  (Tr. 429, 435.)

He performed various strength, exertional, and postural activities, but did not perform kneeling or crawling.  (Tr. 431-34.)  The most he was observed to lift was seventeen pounds.  (Tr. 431, 435.)  He demonstrated an antalgic gait.  (Tr. 432.)  Dr. Godek and PT Hart concluded that the testing was valid, and further concluded that during a workday Mr. Sallaz could: work for four to five hours; sit for four to five hours, sixty minutes at a time; stand for zero hours, five minutes at a time; walk for one to two hours, and occasionally walk short distances; occasionally balance and squat; occasionally use his feet and hands; minimally occasionally bend/stoop, climb stairs, and crouch; and never crawl or kneel.  (Tr. 429, 435.)

**b.  Treating Source**

Mr. Sallaz' primary care provider Dr. Miller offered his medical opinion on November 17, 2020 in a form provided to him by Mr. Sallaz' attorney.  (Tr. 437-38.)  Dr. Miller listed the conditions he treated Mr. Sallaz for as: "chronic lumbar back pain" and "post-surgical hypothyroidism."  (Tr. 437.)  He checked "yes" in response to several questions, indicating: (1) he reviewed the November 2, 2020 FCE assessment, agreed with it, and adopted its results; (2) Mr. Sallaz would be unable to perform any full-time occupations; (3) the FCE was an accurate reflection of Mr. Sallaz' limitations from April 2019 to the present; (4) Mr. Sallaz would need additional breaks or be off task in order to perform full-time work; (5) breaks would, on average, cause Mr. Sallaz to be off task more than 15% of a workday; and (6) Mr. Sallaz would, on average, be absent from work at least two days per month because of his conditions if full-time work was attempted.  (Tr. 437-38.)  When asked to provide explanation for his answers or any other comments, Dr. Miller wrote: "limitations in strength + repetitive behaviors."  (Tr. 438.)

### c.  State Agency Medical Consultants

State agency medical consultant Diane Manos, M.D., reviewed the record on initial review on August 26, 2019 and assessed Mr. Sallaz' physical residual functional capacity.  (Tr. 91-92.)  She opined that Mr. Sallaz could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about four hours in an eight-hour workday; sit about six hours in an eight-hour workday; push and/or pull unlimitedly, other than as indicated for lift and/or carry; occasionally kneel, crouch, crawl, and climb ladders/ropes/scaffolds/ramps/stairs; and frequently stoop.  (*Id*.)

State agency medical consultant Rebecca R. Neiger, M.D., reviewed the record on reconsideration on May 7, 2020.  (Tr. 103-04.) She affirmed Dr. Manos' physical residual functional capacity finding. (*Id*.)

### 3.  Post-Decision Medical Record

Dr. Godek and PT Hart reviewed the ALJ's January 13, 2021 decision and authored a letter in response to the ALJ's findings relative to their opinions.  (Tr. 196-97.)  They provided information regarding the KEY Method system used to conduct the FCE.  (Tr. 196-97, 171-95.) They also addressed the ALJ's persuasiveness determination and findings regarding validity, kneeling and crawling limitations, sitting tolerance, and antalgic gait.  (Tr. 196-97.)

## C.  Hearing Testimony

### 1.  Plaintiff's Testimony

Mr. Sallaz testified at the October 15, 2020 hearing.  (Tr. 49-79.)  He reported that he broke his right leg in 2003 when he was hit by a car, and that he broke his left leg in 2017 when a tree he was cutting down fell on his left leg.  (Tr. 58-59, 64-65.)  He testified that he had rods in both legs.  (Tr. 59.)  He said he was able to return to work after the injury to his right leg in 2003,

but was unable to return to work after the injury to his left leg in 2017.  (Tr. 59-60.)  He explained that he was in a lot more pain and had nerve damage that limited what he was able to do.  (Tr. 60, 64.)  He rated his pain an eight out of ten all day long.  (Tr. 60.)

Mr. Sallaz also reported that he had lower back pain because his right leg was shorter than his left leg, which had gotten worse since he broke his left leg in 2017.  (Tr. 61, 64-65.)   He described his back pain as constant.  (Tr. 65.)  He also reported right hip pain.  (Tr. 68.)  He wore a quarter-inch shoe lift to try to address the height difference in his legs, but reported that it did not help much.  (Tr. 61.)  He thought a special shoe with a one-inch lift might help.  (Tr. 61.)  He did not get a special shoe when he first broke his leg because he lost his insurance, but admitted he had not looked into getting a special shoe during the two years before the hearing when he had insurance.  (Tr. 61-62.)   He noted he was not sure if the government insurance he had would cover the cost of the shoe.  (Tr. 62-63.)

Mr. Sallaz reported that he was trying to get into pain management.  (Tr. 60, 65.)  He had not tried physical therapy for his pain.  (Tr. 68-69.)  He explained that he also did not have physical therapy for his broken leg because he did not have insurance at the time.  (Tr. 69.)  He took Tylenol for his pain, but said it really did not help.  (Tr. 65-66.)  He tried a TENS unit but reported that it did not work.  (Tr. 71.)

Mr. Sallaz said he did not think he could perform a job where he sat all day.  (Tr.  73.) He could sit from ten to thirty minutes at a time, but his legs would go numb if he did not get up and walk around after sitting for half-an-hour.  (Tr. 63.)  He could walk for about ten minutes before needing to sit down due to pain in his legs.  (Tr. 61.)  He reported that he did not walk very well and had a limp, but did not use an assistive device for walking.  (Tr. 63-64.)

Mr. Sallaz went to the store about once a month, usually with his step-dad. (Tr. 67, 70.) He was able to cook and clean, but had to take breaks after about ten minutes.  (Tr. 66, 69-70.) His family and friends assisted him with some chores, like unloading things and mowing the grass.  (Tr. 66, 70.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 74-80.)  The VE classified Mr. Sallaz' past work as a machine helper, a semi-skilled, heavy exertional job.  (Tr. 75.)  The ALJ asked the VE several different hypotheticals.  (Tr. 75-79.)  In response to a hypothetical that described an individual with the sedentary RFC ultimately assessed by the ALJ, the VE testified that the individual would not be able to perform Mr. Sallaz' past work but there were other jobs that the individual could perform, including cutter-paster, addresser, and sorter.  (Tr. 23, 77-78.)

### III.      Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV.    The ALJ's Decision

In her January 13, 2021 decision, the ALJ made the following findings:[2]

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.  (Tr. 18.)

---

[2] The ALJ's findings are summarized.

2.     The claimant has not engaged in substantial gainful activity since April 23, 2019, the alleged onset date.  (*Id*.)

3.     The claimant has the following severe impairments: status post (s/p) closed left femur fracture with intramedullary rod placement (internal fixation), and s/p remote (2003) right femur fracture with intramedullary rod placement, with meniscal degeneration of the right knee and ossified body at the left knee; degenerative disc disease (DDD) of the lower lumbar spine; and depressive disorder and borderline intellectual functioning (BIF).  (Tr. 18-19.)

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 20-23.)

5.     The claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that he is further limited in the following non-exertional respects: can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs; can frequently stoop, and can occasionally kneel, crouch, and crawl; should avoid exposure to dangerous moving machinery and unprotected heights and should perform no commercial driving; can perform 1-step to 3-step, short cycle, simple tasks in a setting free of fast-paced production requirements and strict production quotas and that is routine and predictable; and he should perform no tasks that involve customer service duties, confrontation, conflict resolution, directing the work of others, persuading or influencing others, or being responsible for the safety or welfare of others.  (Tr. 23-35.)

6.     The claimant is unable to perform any past relevant work.  (Tr. 35.)

7.     The claimant was born in 1984 and was 34 years old, which is defined as a younger individual age 18-44, on the alleged disability date.  (Tr. 36.)

8.     The claimant has at least a high school education.  (*Id*.)

9.     Transferability of job skills is not material to the determination.  (*Id*.)

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including cutter-and-paster, addresser, and nut sorter.  (Tr. 36-37.)

Based on the foregoing, the ALJ determined that Mr. Sallaz had not been under a disability from April 23, 2019 through the date of the decision.  (Tr. 37.)

11

## V.    Plaintiff's Argument

Plaintiff's sole assignment of error is that the RFC is not supported by substantial evidence because the ALJ failed to properly evaluate the opinion of Dr. Godek and PT Hart and the opinion of Dr. Miller.  (ECF Doc. 8, pp. 7-14; ECF Doc. 10, pp. 1-4.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Request for Review of Post-Decision Evidence Under Sentence Six**

The Sixth Circuit has explained that "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision," and can only consider it as the basis for a sentence six remand. *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  There are two kinds of remand under Section 405(g): a "sentence four remand" made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a "sentence six remand" where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See*

13

*Melkonyan v. Sullivan*, 501 U.S. 89, 97–101, 111 S.Ct. 2157, 2163–64, 115 L.Ed.2d 78 (1991);

*see also Hollon v. Comm'r od Soc. Sec.*, 447 F.3d 477, 486 (6th Cir. 2006).  This Court is not

permitted to consider evidence that was not submitted to the ALJ in the sentence four context,

but may consider such evidence to determine whether a sentence six remand is appropriate.  *See*

*Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

 Although Mr. Sallaz relies on evidence submitted after the ALJ decision to support his

appeal (ECF Doc. 8, pp. 5-6, 8), he does not assert until a footnote in his reply brief that "[t]his

Court has the ability to review this evidence under a sentence six (6) analysis instead of sentence

four (4)" (ECF Doc. 10, p. 3, n. 3).  He argues that the evidence is "new and material" under the

applicable standard, but does not address the question of "good cause."  (*Id.*)  *See Hollon*, 447

F.3d at 483 (holding a claimant seeking remand under sentence six must demonstrate that the

evidence he presents in support of a remand is new and material, and that there was "good cause"

for his failure to present the evidence in the prior proceedings).

 The undersigned finds that Mr. Sallaz has not properly advanced his argument for a

sentence six remand.  First, he did not request a sentence six remand in his opening brief.  "The

Sixth Circuit has made clear that issues raised for the first time in a reply brief are waived."

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (citation omitted).  Second, he

did not adequately develop the argument in his reply brief, raising it only in a footnote and

failing to address "good cause."  (ECF Doc. 10, p. 3, n. 3.)  The Sixth Circuit has also made it

clear that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at

developed argumentation, are deemed waived."  *See McPherson v. Kelsey*, 125 F.3d 989, 995–

996 (6th Cir. 1997) (internal citations omitted).

For the reasons stated above, the undersigned finds Mr. Sallaz has waived any request for a sentence six remand.  Further, because it is not appropriate to consider post-decision evidence in connection with a sentence four remand request, the undersigned will not consider the post-decision evidence in addressing Mr. Sallaz' sole assignment of error below.

## C.    Sole Assignment of Error: Whether RFC is Supported by Substantial Evidence

In his sole assignment of error, Mr. Sallaz argues the RFC is not supported by substantial evidence because the ALJ did not properly evaluate the November 2, 2020 opinion of Dr. Godek and PT Hart (hereinafter "Dr. Godek," for ease of reference) and the November 17, 2020 opinion of Dr. Miller.  (ECF Doc. 8, pp. 7-14; ECF Doc. 10, pp. 1-4.)  The Commissioner responds that substantial evidence supports the ALJ's evaluation the two opinions.  (ECF Doc. 9, pp. 14-21.)

### 1.    Regulations Regarding Evaluation of Medical Opinions

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical

opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

### 2.  Whether ALJ Properly Evaluated Persuasiveness of Dr. Godek's Opinion

In arguing that the ALJ erred in finding Dr. Godek's opinion not persuasive, Mr. Sallaz does not dispute that the ALJ considered "supportability and consistency," but argues that her reasoning "was not permitted under the law, nor was it supported by substantial evidence." (ECF Doc. 8, pp. 7-8.)  Both arguments will be addressed in turn

### i.  Whether ALJ Analysis of Medical Opinion Was Legally Permitted

Mr. Sallaz argues that the ALJ was not permitted to "dissect[] or discredit[]" Dr. Godek's opinion because FCE testing is objective and the ALJ does not have a medical license.  (ECF Doc. 8, pp. 8-9.)  The Commissioner argues in response that Mr. Sallaz has "conflate[d] the medical signs gleaned from the FCE with the resulting medical opinion" in suggesting that the ALJ was "playing doctor," when in fact she was executing her regulatory duty to evaluate the supportability and consistency of Dr. Godek's medical opinion.  (ECF Doc. 9, pp. 18-19.)

Specifically, Mr. Sallaz argues that the ALJ was "clearly questioning and arguing against the validity of" the objective findings in the FCE when she "questioned the existence of upper

extremity limitations, postural limitations, [and] the presence of an antalgic gait," when she "claim[ed] the test was based on subjective complaints instead of objective results," and when she "question[ed] the validity because of the length of the test." (ECF Doc. 8, p. 9.) A review of the ALJ's actual findings and conclusions does not support any of these arguments.

As to upper extremity limitations, the ALJ found Dr. Godek's opined limitation to "occasional simple and fine grasping" was not supported by observations in the FCE and "[did] not correlate to the nature and location of the claimant's physical impairments affecting the lower lumbar spine and lower extremities." (Tr. 32-33.) This finding was consistent with the ALJ's duty to ensure that "[t]he RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments . . ." SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 2, 1996). Regardless of any grip dynamometer findings in the FCE, substantial evidence supported the ALJ's finding that Dr. Godek's opinion regarding upper extremity limitations was "not persuasive" because no showing was made to correlate upper extremity manipulative limitations with Mr. Sallaz' medically determinable impairments, which related to his lower back and lower extremities.

As to Dr. Godek's clinical observation of an antalgic gait, the ALJ found that observation was "not consistent" with clinical observations of his gait by his primary care physician and orthopedic surgeon, and therefore concluded that Dr. Godek's observation "do[es] not support the full extent of opined walking limitation of only one hour." (Tr. 33.) In so holding, the ALJ was not finding Dr. Godek's clinical observation at the FCE was incorrect. Instead, she was appropriately analyzing how "consistent" Dr. Godek's opinion (that Mr. Sallaz could walk no more than one to two hours in a workday) was "with the evidence from other medical sources

and nonmedical sources in the claim," 20 C.F.R. § 404.1520c(c)(2), specifically the clinical observations of his gait by his primary care doctor and orthopedic surgeon.

Regarding the ALJ's statement that "[s]ubjective reports of pain appear to be the basis of most limitations assessed, including standing and sitting" (Tr. 33), a review of the FCE opinion reveals that this finding was supported by substantial evidence.  For standing tolerance, the FCE records one objective observation ("3 minutes demonstrated during assembly/disassembly activities") and several "[r]eported or demonstrated" subjective complaints ("My back is hurting already.  The right side is pinching real bad." / "The standing really does it.  Whatever controls my back or my legs, my pain goes up.").  (Tr. 433.)  As to sitting tolerance, the FCE records objective observations of Mr. Sallaz' physical behavior during a 60-minute activity, but also subjective reports which include: "I'm okay until my legs go numb" and "It was a long drive here and a lot of sitting doing paperwork."  (*Id*.)  Other testing and observations recorded in the FCE regarding pushing, pulling, lifting, and postural components also highlighted Mr. Sallaz' subjective complaints as he performed different tasks, including his subjective reports at the time each type of testing was terminated.  (Tr. 431-32.)  Based on this information, the undersigned finds substantial evidence supported the ALJ's conclusion that Mr. Sallaz' subjective reports of pain appeared to be the basis of many opined limitations.

The ALJ then found in that context that subjective reports of pain by Mr. Sallaz were "less persuasive because [he] [had] simply not pursued any medical treatment for pain beyond a few *ad hoc* knee injections from his primary care doctor."  (Tr. 33.)  Mr. Sallaz argues that this observation "had no value in showing the objective test's finding was incorrect."  (ECF Doc. 8, p. 10.)  This is again a misperception of the ALJ's analysis.  After observing that Dr. Godek's opinion regarding sitting and standing tolerances appeared to be based in part on subjective

reports of pain, the ALJ was required to consider whether those limitations were "consistent with the evidence from other medical sources and nonmedical sources" as to Mr. Sallaz' pain.  20 C.F.R. § 404.1520c(c)(2).  Her discussion of Mr. Sallaz' limited medical treatment for pain was appropriate in assessing the "consistency" of Dr. Godek's opinion with other medical evidence.

The ALJ additionally noted: "observing that [Mr. Sallaz] sat for 60 minutes during a two and one-half hour physical assessment that, by design, had tasked him with tasks to perform on his feet does not persuasively suggest a frank limitation in continuous sitting ability."  (Tr. 33.) Mr. Sallaz argues that this amounts to "questioning the validity because of the length of the test." (ECF Doc. 8, p. 9.)  His characterization again misses the mark.  This observation addressed the issue of "supportability," i.e., the extent to which "the objective medical evidence and supporting explanations presented by a medical source . . . support his . . . medical opinion(s)."  20 C.F.R. § 404.1520c(c)(1).  The ALJ is not questioning the validity of the FCE process itself, but rather the extent to which observations of Mr. Sallaz' behavior for sixty minutes "during keyboard and history review activity" support a broad medical opinion that Mr. Sallaz cannot tolerate sitting for longer than four to five hours in a workday or more than sixty minutes at any one time.

Ultimately, the undersigned does not find that the ALJ improperly invalidated the FCE test results or played doctor.  The ALJ was not required to adopt Dr. Godek's opinion or any of the specific limitations contained therein.  This is because "[t]he responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing See 20 C.F.R. §§ 404.1546(c), 416.946(c)).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."

*Poe*, 342 F. App'x at 157.  Indeed, an ALJ must assess a claimant's "residual functional capacity based on all the relevant evidence in [the] case record."  20 C.F.R. § 404.1545(a)(1).

For the reasons stated, the undersigned finds Mr. Sallaz has not demonstrated that the ALJ improperly substituted her own knowledge or expertise for that of Dr. Godek.  Instead, she appropriately discussed the supportability and consistency of Dr. Godek's medical opinion.

### ii. Whether ALJ Finding Was Supported by Substantial Evidence

Mr. Sallaz' second argument is that the ALJ's individual stated reasons for finding the opinion not persuasive lacked the support of substantial evidence.  (ECF Doc. 8, pp. 9-10.)  In particular, he argues that the ALJ erred: (1) in finding Dr. Godek did not support many of his limitations with observations; (2) in criticizing Dr. Godek for finding an antalgic gait; (3) in criticizing the opinion that Ms. Sallaz could not engage in kneeling and crawling because that activity was not tested; (4) in finding that subjective reports of pain appeared to be the basis of most limitations assessed; (5) in arguing that some FCE findings did not correlate to the nature and location of Mr. Sallaz' physical impairments; and (6) in failing to address Dr. Godek's finding that Mr. Sallaz would be limited to a five hour workday.  (*Id.* at pp. 9-11.)

In response to the ALJ's observation that Dr. Godek "did not support many of [his] limitation with any observations" (Tr. 32), Mr. Sallaz argues that there was a "plethora of 'observations' covering three (3) whole pages under the section titled 'TESTING AND OBSERVATIONS.'"  (ECF Doc. 8, p. 9.)  But a review of the ALJ's decision reveals that she considered many of the observations outlined in that section, including findings of normal cervical mobility, observations of an antalgic gait, the lack of testing for kneeling and crawling, observations of Mr. Sallaz while he sat for 60 minutes, and extensive notes regarding Mr. Sallaz' subjective reports of pain while performing various activities.  (Tr. 32-33.)  The ALJ did not find

that the FCE lacked observations.  Rather, she found the opined limitations were not entirely supported by observations that were made.  This was consistent with her duty to address the extent to which "the objective medical evidence and supporting explanations presented by a medical source are to support his . . . medical opinion(s)."  20 C.F.R. § 404.1520c(c)(1).

The undersigned already addressed in section VI.C.2.i., *supra*, the argument that the ALJ erred in finding Dr. Godek's observation of an antalgic gait was "not consistent with" the prior clinical examination findings of his primary care doctor and orthopedic surgeon, and will not revisit the issue here.  Mr. Sallaz also argues that the ALJ erred in finding the observation inconsistent with his orthopedic surgeon's "observation in 2019 for 'slightly' antalgic gait" because Dr. Stefancin actually noted an antalgic gait at two separate visits in 2019.  (ECF Doc. 8, pp. 9-10.)  There is nothing in this minor distinction to disturb a finding that the ALJ's observation regarding consistency was supported by substantial evidence.

Mr. Sallaz also challenges the ALJ's finding that the opinion that Mr. Sallaz can never kneel or crawl is "expressly unsupported because [Mr. Sallaz] simply did not perform those activities as part of the FCE" (Tr. 33), arguing that the FCE's detailed record of his subjective complaints during the examination made it "quite obvious" why he was not tested on kneeling and crawling.  (ECF Doc. 8, p. 10.)  While those subjective reports are certainly noted in the FCE, that document gave no specific explanation as to why crawling and kneeling testing was not performed.  (Tr. 432.)  The ALJ therefore did not err in finding Dr. Godek's opinion that Mr. Sallaz could never kneel or crawl lacked supportability, i.e., "objective medical evidence and supporting explanations presented by a medical source."  20 C.F.R. § 404.1520c(c)(1).[3]

---

[3] Mr. Sallaz attempts to correct this deficiency by citing to an explanatory letter that was submitted after the ALJ decision was issued.  (ECF Doc. 8, p. 10 (citing Tr. 196-97).)  This argument is futile, as the Court cannot consider post-hearing evidence in assessing whether the ALJ's decision was supported by substantial evidence.

The undersigned already found in section VI.C.2.i., *supra*, that the ALJ was supported by substantial evidence in finding that many of the limitations in Dr. Grodek's opinion appeared to be based on subjective reports of pain, and that the ALJ appropriately considered Mr. Sallaz' limited treatment for pain as part of her "consistency" analysis.

Mr. Sallaz also suggests the ALJ mischaracterized the extent of his treatment for pain when she said he had not pursued treatment for pain "beyond a few *ad hoc* knee injections from his primary doctor" (Tr. 33).  (ECF Doc. 8, pp. 10-11.)  In fact, the ALJ engaged in a lengthy discussion of Mr. Sallaz' history of treatment for pain.  She noted that he managed his pain through over-the-counter pain medications and a few knee injections.  (Tr. 26.)  She discussed his treatment with Dr. Stefancin, including his decision not to pursue a procedure to address a loose body in his left knee.  (*Id.*)  She noted his failure to seek pain medications or a shoe lift despite having insurance since early 2019.  (*Id.*)  She went on to explain:

> Mr. Sallaz maintained at the hearing that he was trying to get into a pain management program but ultimately confirmed that he remains without any prescribed medical treatment for allegedly constant and severely intense (8/10) low back pain (see also Ex. B10E). Dr. Miller did indicate that he was sending him for evaluation possibly to have epidural injections to the back at the September 2020 follow-up and noting the MRI's findings including a "herniated disc" (Ex. B9F/2). Instead of pursuing such initial medical treatment for back pain over the past two years, Mr. Sallaz elected to undergo a functional capacity evaluation ("functional whole body assessment") after the hearing, on November 2, 2020 (*see* Ex. B10F). While accepting that the "FCE" was done at Dr. Miller's request, as stated by the conducting physical therapists on its report, the post-hearing occurrence of the FCE and questionnaire authored by the claimant's attorney and directed to Dr. Miller expressly in regards to its findings (*see* Ex. B11F) strongly suggest that this evaluation was done in direct connection with this application for disability benefits and to generate further evidence of essentially minimally treated knee conditions and untreated symptoms of low back pain and leg numbness. Every due consideration has been given to the physical therapists' clinical observations made during the post-hearing FCE, including antalgic gait and the claimant's voiced complaints of pain on tested maneuvers (*see* Ex. B10F/5-7), but the lack of treatment in spite of admittedly having health insurance over the past two years, conflicting observations made by Dr. Miller in two 2020 office visits for normal gait, and the other medical evidentiary factors discussed above do not support

22

accepting the findings offered by the physical therapists as conclusive or persuasive medical evidence about the claimant's maximum abilities for exertional and nonexertional work-related activities.

(Tr. 27-28.)  The undersigned finds the ALJ did not misconstrue the record as to Mr. Sallaz' limited treatment for pain when she assessed the consistency of Dr. Godek's opinion.

The undersigned already found in section VI.C.2.i., *supra*, that the ALJ was supported by substantial evidence in finding Dr. Godek's opinion as to upper extremity limitations was not persuasive because it did not correlate to Mr. Sallaz' medically determinable impairments. Indeed, Mr. Sallaz agrees that he "does not argue that these [grip] limitations are relevant as to why [he] is disabled."  (ECF Doc. 8, p. 11.)

Mr. Sallaz' final argument is that the ALJ's analysis does not address Dr. Godek's most important finding, that he would be limited to a maximum five-hour workday.  (*Id.*)  This is not so.  As discussed above, the ALJ noted observations of an antalgic gait and his behavior while sitting for sixty minutes, but also noted the FCE's detailed recitation of Mr. Sallaz' subjective reports of pain.  She contrasted these findings to his treatment records, and in particular his failure to seek any significant treatment for what he described as significant levels of pain.  She then found that the medical opinions were not persuasive due to the "various reasons of limited supportability and overall inconsistency with the other medical evidence of record."  (Tr. 33.)

For the reasons set forth above, the undersigned finds the ALJ appropriately considered consistency and supportability when assessing the persuasiveness of Dr. Godek's opinion.  She did not ignore Mr. Sallaz' back, knee, or spine impairments, instead finding he had the RFC to perform only a reduced range of sedentary work.  (Tr. 23-35.)  Mr. Sallaz has not met his burden to show the ALJ's evaluation of Dr. Godek's opinion lacked the support of substantial evidence. Thus, the undersigned finds no reversible error in the evaluation of Dr. Godek's opinion.

### 3.    Whether ALJ Properly Evaluated Persuasiveness of Dr. Miller's Opinion

Mr. Sallaz also argues that the ALJ erred in finding Dr. Miller's opinion not persuasive.

In finding Dr. Miller's opinion not persuasive, the ALJ explained:

> On November 17, 2020, Dr. Daniel Miller responded to the short questionnaire
> from the claimant's attorney, and he "agreed with and adopted" the FCE's results
> (Ex. B11F/2-3). Dr. Miller also agreed with the questions proposing that the
> claimant's symptoms would cause him to take additional breaks with a result that
> he would be "off task" for more than 15% of a workday and to be absent at least
> two days per month. Dr. Miller's opinion is **not persuasive** for many of the reasons
> discussed in relation to the FCE itself, but also because of very limited support
> offered beyond broadly stated "chronic lumbar back pain" and postsurgical
> hypothyroidism and "limitations in strength and repetitive behaviors." The
> hypothyroidism is not a strong basis for limitation when considering that it has not
> been discussed as problematic since March 2019 return visit, at which time Dr.
> Miller had the claimant resume prescribed levothyroxine following a gap in
> treatment. Further, the "limitation[] in strength" as stated support is not consistent
> with his own findings on physical examinations for full 5/5 strength in both lower
> extremities, which the orthopedic specialist had also notably found. Dr. Miller
> offered no consideration to the lack of back pain mentioned until June 2020 return
> visit or the only recently offered (but not yet received) treatment for that symptom,
> and he curiously failed to mention any knee/femur conditions or administering
> steroid injections to the left or both knees at office visits. The undersigned cannot
> find Dr. Miller's opinion for off task behavior and absences well supported or
> consistent with his own office notes and other evidence in the record.

(Tr. 33 (emphasis in original).)

The ALJ clearly addressed both supportability and consistency.  Mr. Sallaz nevertheless

contends that the ALJ's finding as to the persuasiveness of Dr. Miller's opinion was not

supported by substantial evidence.  (ECF Doc. 8, pp. 11-14.)  To the extent this challenge rests

on arguments advanced in connection with his challenge to Dr. Godek's opinion (ECF Doc. 8, p.

12; ECF Doc. 10, p. 4), the undersigned finds them unavailing for the reasons set forth above.

Mr. Sallaz admits that the ALJ addressed the factors of supportability and consistency,

but argues that the ALJ did not consider other regulatory factors that weigh in favor of finding

Dr. Miller's opinion persuasive.  (ECF Doc. 8, p. 12.)  Specifically, he argues that Dr. Miller's

relationship with the claimant (nine years as Mr. Sallaz' treating physician) and specialization (family medicine) made him qualified to address Mr. Sallaz' ongoing spine condition.  (*Id.* (citing 20 C.F.R. § 404.1520c(c)(1)-(5)).  While Dr. Miller's treating relationship and specialty were certainly factors the ALJ could consider, she was only required to explain how she considered the factors consistency and supportability.  20 C.F.R. § 404.1520c(b)(2).  Mr. Sallaz has not shown that the ALJ's failure to address Dr. Miller's treating relationship with Mr. Sallaz and/or medical specialty deprived her analysis of substantial evidence.

Mr. Sallaz also argues that supportability and consistency did not support the ALJ's analysis, challenging the ALJ's observation that one of the few supporting statements in Dr. Miller's opinion – a note stating "limitations in strength" – was not consistent with Dr. Miller's own examination findings.  (ECF Doc. 8, p. 13.)  Mr. Sallaz acknowledges that Dr. Miller found full strength in his lower extremities on examination, but contends that "contextual clues" indicate Dr. Miller's reference to "limitations in strength" was addressing his back pain.  (*Id.*)  This argument fails for several reasons.  First, the supportability analysis is required to focus on the "supporting explanations" provided by the medical source in his opinion, not contextual clues.  20 C.F.R. § 404.1520c(c)(1).  Second, the supportability analysis must also focus on "objective medical evidence" from the medical source, which the ALJ did in observing that Dr. Miller's records lacked clinical findings or other objective medical evidence demonstrating "limitations in strength."  *Id.*  Finally, the ALJ specifically addressed her consideration of Mr. Sallaz' treatment for back pain, explaining: "Dr. Miller offered no consideration to the lack of back pain mentioned until June 2020 return visit or the only recently offered (but not yet received) treatment for that symptom[.]"  (Tr. 33.)  In other words, the ALJ considered the fact that Mr. Sallaz' complaints to Dr. Miller regarding his back were recent and so far untreated.

Given the foregoing, the undersigned concludes that the ALJ sufficiently explained her reasons for finding Dr. Miller's opinion was not supported by or consistent with the evidence, and that Mr. Sallaz has not shown those reasons lacked the support of substantial evidence. Thus, the undersigned finds no reversible error in the ALJ's evaluation of Dr. Miller's opinion.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision

June 26, 2023                                    */s/ Amanda M. Knapp*
                                                AMANDA M. KNAPP
                                                UNITED STATES MAGISTRATE JUDGE

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 Dated: April 17, 2023(1985).